# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5975 | **DATE** | 12/13/2002 |
| **CASE TITLE** | CHRISTOPHER WILSON vs. RUSSELL-STANLEY CORP. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: there is no genuine issue of material fact on the claim for disparate treatment that plaintiff asserts against defendant. Defendant is entitled to judgment as matter of law. Accordingly, defendant Russell-Stanley Corp.'s motion for summary judgment on this claim is granted. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | DEC 1 6 2002 | |
| | Notified counsel by telephone. | date docketed | 22 |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| TBK | courtroom deputy's initials | 02 DEC 13 AM 10:40 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER WILSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01 C 5975 |
| | ) | Paul E. Plunkett, Senior Judge |
| **RUSSELL-STANLEY CORP.,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Christopher Wilson has sued Russell-Stanley Corporation for its alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981. Defendant has filed a Federal Rule of Civil Procedure 56(c) motion for summary judgment on this claim. For the reasons set forth below, the motion is granted.

DOCKETED
DEC 16 2002

### Facts

Unless otherwise noted, the following facts are either undisputed or deemed admitted because plaintiff's response failed to comply with Local Rule 56.1 ("LR 56.1"), a local rule which this Court enforces.[1] See Smith v. City of Chicago, 2002 WL 1770532 (N.D. Ill. Aug. 1, 2002). Plaintiff, an

---

[1] Specifically, plaintiff has failed to comply with LR 56.1(b). In its response, plaintiff should have responded directly to each of the statements in defendant's 56.1(a)(3) Statement of Material Facts ("Def.'s LR 56.1(a) Stmt."). Disagreement with any of defendant's 56.1(a)(3) statements should have been indicated with specific reference to the portions of the record on which plaintiff relies for his disagreement. See N.D. Ill. R. 56.1(b)(3)(A). Instead, plaintiff presented his own statement of material facts without any attempt to reconcile his statements with those of defendant. Defendant, in its reply, attempts to relate the two sets of statements; we will attempt to do the same.

African-American male, was hired by Smurfit Plastics in August 1991. (Pl.'s LR 56.1(b) Stmt. ¶ 5.) He worked at the Addison, Illinois plant. (Id. ¶¶ 3, 7.) Defendant is a manufacturer of plastic chemical containers. (Def.'s LR 56.1(a) Stmt. ¶ 1.) In 1997, defendant purchased Smurfit Plastics, and plaintiff became an employee of defendant, still working at the Addison plant. (Id. ¶¶ 6, 7.) At the time of the acquisition, plaintiff was a production mechanic. (Id. ¶ 12.) After the acquisition, defendant began implementing improvements in product quality and efficiency at the Addison facility, such as revising paperwork requirements, reducing the work force, changing job classifications, increasing quality standards and implementing standard operating procedures. (Def's LR 56.1(a) Stmt. ¶ 11.) In March 1998, plaintiff was promoted to a team leader position in the blow molding department, the top supervisory employee on the S2 (night) shift. (Def.'s LR 56.1(a) Stmt. ¶ 13.)

Team leaders are responsible for assignment of the workforce on their shifts (including attendance, scheduling vacation and training), safety within the department, machine operation and productivity (including abiding by standard procedures and producing quality product) and cleanliness of the work area. (Id. ¶¶ 51, 52). Shift activities and essential information are communicated to management via "paperwork". (Def.'s LR 56.1(a) Stmt. ¶ 41; Pl. Dep. at 160-61.)

At the time of plaintiff's promotion, Jim Black, a Caucasian, was the plant manager. (Def.'s LR 56.1(a) Stmt. ¶ 13.) As a team leader, plaintiff reported directly to Black. (Id. ¶ 15.) Black was a fair and racially unbiased manager. (Id. ¶ 16.) In late 1998, Greg LaValle was transferred to the Addison plant from another of defendant's facilities and served as the Addison plant supervisor, a new management position between team leader and plant manager. (Def.'s LR 56.1(a) Stmt. ¶ 17.) Thus, by December 1998, plaintiff reported directly to Greg LaValle, who in turn reported to Black.

(Id.) In November 1999, Black was replaced by Mark McGrew, who transferred to the Addison facility from another of defendant's facilities. (Pl.'s LR 56.1(b) Stmt. ¶¶ 18, 19.) At the time McGrew transferred to the Addison facility, the four team leaders in the blow molding department, including plaintiff, were African-American. (Def.'s LR 56.1(a) Stmt. ¶¶ 19, 20.)

According to defendant, plaintiff had difficulty with the leadership requirements of the team leader position. (Id. ¶ 27.) Plaintiff specifically had trouble with safety, quality, housekeeping and the management of his subordinates. (Id.) He also had trouble with the necessary paperwork, such as production reporting, scrap reporting, downtime reporting, and had difficulty following standard operating procedures. (Id. ¶ 28.) Plaintiff was counseled numerous times by LaValle about his inaccurate or incomplete paperwork. (Id. ¶ 31.) According to LaValle, there were approximately 100 instances where plaintiff submitted incorrect scrap reports.[2] (Id. ¶ 29.) Accurate scrap reports are important because they affect inventory records. (Def.'s LR 56.1(a) Stmt. ¶ 44.) If inventory records are wrong, a truck may arrive at the warehouse expecting to be loaded with drums of material that simply would not be there. (Id.) The Addison facility had several problems because of incorrect inventory records; LaValle undertook efforts to reduce incidents of incomplete or inaccurate paperwork. (Id.)

LaValle also counseled plaintiff about other areas of his performance. (Pl.'s LR 56.1(b) Stmt. ¶ 104.) LaValle became concerned that his verbal counseling and written reminders to plaintiff were having no effect; as a result, he issued written discipline to plaintiff. (Def.'s LR 56.1(a) Stmt. ¶ 35.) Plaintiff received numerous disciplinary memoranda, including memoranda relating to safety

---

[2] Scrap reports are daily production reports. They show "the cycles of the machine, how many good parts ... [and] how many rejects they made and how much run time ... [and] downtime ... they had." (LaValle Dep. at 60.)

violations, quality problems, and poor supervisory decisions. (Def.'s LR 56.1(a) Stmt. ¶ 34; Def.'s Exs. V(E), (G), (H), (I), (J), (M).) The frequency of disciplinary actions against plaintiff, both oral and written, increased prior to November 2000. (Def.'s LR 56.1(a) Stmt. ¶ 39.) In November 2000, McGrew demoted plaintiff to the position of "troubleshooter" because plaintiff lacked leadership skills and failed to take responsibility for his shift. (Def.'s LR 56.1(a) Stmt. ¶¶ 45, 47, 94.)

Plaintiff admits he made mistakes in his paperwork (Def.'s LR 56.1(a) Stmt. ¶ 32, 33; Pl. Dep. at 122, 126-27.) He claims, however, that he was a victim of defendant's discriminatory employment practices. (Compl. ¶ 10.) According to plaintiff, defendant singled him out for a demotion because of his race and then created a paper file on which defendant could justify its action.

Plaintiff filed a complaint against defendant, alleging racial discrimination in violation of 42 U.S.C. ¶ 2000e et. seq. and 42 U.S.C. ¶ 1981. He claimed disparate treatment, disparate impact, harassment, retaliation and intentional infliction of emotional distress. Defendant filed a motion for summary judgment on all counts. Plaintiff responded to defendant's motion on the count of disparate treatment and withdrew his complaint as to the other counts.

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all

evidence and draw all inferences in favor of the non-moving party. <u>Michas v. Health Cost Controls of Illinois, Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. <u>Id.</u>

## Discussion

Before reaching the merits of plaintiff's case, it should be noted that both parties were careless when citing to portions of the record for support of their statements of material facts. On more than one occasion, the cite did not support the statement, or pages of cited deposition testimony were missing from submitted materials. As a result, our job was rendered considerably more difficult.

Plaintiff alleges that defendant demoted plaintiff in violation of Title VII and 42 U.S.C. § 1981. The methods of proof of the two claims are "essentially identical". <u>Von Zuckerstein v. Argonne Nat'l Lab.</u>, 984 F.2d 1467, 1472 (7th Cir. 1993). Title VII prohibits employment discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C.A. § 2000e-2 (1994). To defeat defendant's motion, plaintiff must either present direct evidence of defendant's discriminatory intent or prove intent via the burden-shifting method articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Plaintiff has no direct evidence of discriminatory intent. He uses circumstantial evidence in his attempt to satisfy the four elements of a <u>prima facie</u> case under the <u>McDonnell Douglas</u> burden-shifting analysis and cites to <u>Troupe v. May Dep't Stores Co.</u>, 20 F.3d 734 (7th Cir. 1994), for

-5-

support.[3] Since Troupe, the Seventh Circuit has stated that "whether evidence presented is characterized as "indirect" evidence or "mosaic" evidence, 'very often the best way to evaluate plaintiff's case at the summary judgment stage is to use the McDonnell Douglas steps, with appropriate modification . . . .'" Robin v. Espo Eng'g Co., 200 F.3d 1081, 1090 (7th Cir. 2000) (citing Sattar v. Motorola, Inc, 138 F.3d 1164, 1169 (7th Cir. 1998)). Thus we evaluate plaintiff's claim under the McDonnell Douglas burden-shifting analysis.

The McDonnell Douglas analysis requires that plaintiff first demonstrate that he has a prima facie case of discriminatory treatment. He must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly situated persons not in the protected class were treated more favorably. See Johnson v. Zema Sys. Corp., 170 F.3d 734, 742-43 (7th Cir. 1999). If he succeeds, the burden of production shifts to defendant to offer a legitimate, non-discriminatory reason for the adverse action. If defendant carries its burden, the burden then shifts back to plaintiff to show the proffered reasons for the adverse action are merely pretext. See Von Zuckerstein, 984 F.2d at 1472. The ultimate burden to prove discrimination always remains with the plaintiff. See Sattar v. Motorola, 138 F.3d 1164, 1169 (7th Cir. 1998).

There is no dispute that plaintiff has satisfied the first and third elements. Thus, our focus will be on the second and fourth elements.

The record clearly demonstrates that plaintiff was not meeting his employer's legitimate performance expectations. Both plaintiff and LaValle stated that plaintiff was spoken to many times

---

[3] In Troupe, the Seventh Circuit stated that a prima facie case of discriminatory intent can be proven with either direct evidence or by composing a convincing "mosaic of discrimination against the plaintiff." Troupe, 20 F.3d at 737.

about his performance and that plaintiff received memoranda regarding his performance and deficiencies. Plaintiff's April 2000 and December 2000 (presumably covering the months immediately prior to his November 2000 demotion) performance evaluations show he received a "below average" score in many areas.[4]

Plaintiff does not deny that he made mistakes and had difficulty with the paperwork. He argues, however, that although other team leaders made mistakes as well, he was singled-out by management for disciplinary action and that LaValle selectively maintained (to plaintiff's detriment) plaintiff's personnel file.[5] LaValle stated in his deposition testimony that "not every memo or not everything [he] talked about or did a memo about was put in [an employee's] file." (LaValle Dep. at 46.) Only notes and memos that LaValle "flagged" were placed in an employee's file. (LaValle Dep. at 45.)

Because plaintiff was evaluated by LaValle and plaintiff is accusing LaValle, among others, of racial discrimination, it makes little sense to discuss whether plaintiff satisfied defendant's reasonable performance expectations. See Curry v. Menard, Inc., 270 F.3d 473, 477-78 (7th Cir. 2001) (" 'legitimate expectations' prong of the prima facie test is not necessary to the analysis, where

---

[4] "Below average" is defined as "fails to meet expectations in several aspects of job." In April 2000, plaintiff received a below average score in the following areas: quality of work, safety, job knowledge, responsiveness, communication skills and leadership/independence. In December 2000, he received a below average score for quality of work, productivity, job knowledge, communication skills, problem solving and leadership/independence. There are 10 areas of evaluation. (Pl.'s Exs. V (B) & (C).)

[5] It is worth noting that plaintiff did challenge the April and December 2000 evaluations. The evaluation form provides a space for employee comments. On the April 2000 evaluation, plaintiff wrote: "I disagree with this review, but I will step up and exceed what is expected of me." On the December 2000 evaluation, he wrote: "This was a predetermined decision that was made. I've supported this company to the best of my ability and I still will; but this is a bad call in my humble opinion!" (Pl.'s Exs. V (B) & (C).)

the people judging the plaintiff's performance were the same people she accused of discriminating against her") (citing Oest v. Ill. Dep't of Corr., 240 F.3d 605, 612 n.3 (7th Cir. 2001)); Flores v. Preferred Tech. Group, 182 F.3d 512, 515 (7th Cir. 1999) (stating that when plaintiff claims she was disciplined more harshly because she was Hispanic, it makes "little sense in this context to discuss whether she was meeting her employer's reasonable expectations"). We take advantage of the flexibility of the McDonnell Douglas analysis and assume that plaintiff has met this element. See Flores, 182 F.3d at 515 (stating that the Supreme Court has made it clear that the prima facie case "must be adapted to fit the varying facts of discrimination cases").

We now turn to the last element of the prima facie test: whether plaintiff can show similarly situated non-African-Americans were treated differently. A similarly situated employee is one who is "directly comparable in all material respects". Peele v. Country Mutual Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002) (citing Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)). He must be similarly situated "with respect to performance, qualifications, and conduct". Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). This usually demands a showing that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. The cases, however, need not be identical. See Graham v. Long Island RR., 230 F.3d 34, 40 (2d Cir. 2000).

We find that plaintiff has not satisfied this element of the McDonnell Douglas test. Plaintiff seems to rely on circumstantial evidence covering a wide range of topics allegedly demonstrating defendant's system-wide discriminatory employment practices to satisfy this element. Proof of this element, however, requires a more focused comparison – "specific evidence and specific examples

of employees who have been treated more favorably." Dority v. City of Chicago, 2001 WL 115528, at *14 (N.D. Ill. Sept. 28, 2001). Plaintiff does casually offer the examples of John Windhorst, Charles Brigham and William Larson, all Caucasian team leaders, but he does not direct us to specific evidence to suggest they are similarly situated to plaintiff and received more favorable treatment. The burden is on plaintiff to show that these individuals are his "comparators". See Greer v. Board of Educ., 267 F.3d 723, 728 (7th Cir. 2001). His anecdotal evidence falls short on all these grounds. For example, Windhorst was not completely truthful with LaValle when describing an incident involving plaintiff after plaintiff's demotion. Although LaValle thought Windhorst was "covering-up", he did not discipline Windhorst. (LaValle Dep. at 58-59.) Plaintiff wants us to infer that LaValle's failure to discipline Windhorst is evidence of a similarly situated employee receiving more favorable treatment. However, plaintiff does not direct us to Windhorst's personnel file or to any other evidence to show that he and Windhorst were comparable with respect to performance or conduct. A mere reference to LaValle's failure to discipline Windhorst for one failure is hardly comparable to plaintiff's situation.

As for Charles Brigham, plaintiff states generally that Brigham's "personnel file also reflects criticism, including a warning...for not following policy procedure..., average and below average scores on a performance appraisal from LaValle..., a note reflecting...problem paperwork..., and a note reflecting a daily coffee break LaValle and McGrew share together." (Pl.'s LR 56.1(b) Stmt. ¶ 124.) This statement alone is not sufficient to carry plaintiff's burden. A comparison of the performance evaluations shows plaintiff and Brigham are not similarly situated.[6] Plaintiff does not

---

[6] Plaintiff scored "below average" in six of the ten areas on the last two successive performance evaluations as a team leader. Brigham, having been in the job for less time than plaintiff, scored "below average" in only two of these areas on one evaluation. Brigham does have

direct us to anything in the record to suggest he and Brigham were similarly situated in all material respects and that, by not being demoted while he was employed at defendant's facility, Brigham received more favorable treatment.

Plaintiff also fails to carry his burden with respect to Larson. Plaintiff refers us to an incident where, according to plaintiff, Larson was "deceptive" when reporting an incident involving plaintiff to LaValle after plaintiff's demotion. Plaintiff was "written-up" by Larson for the incident, at LaValle's instruction. It was not until about a week after the write-up that Larson explained to LaValle that the incident was "just one of those things that didn't get done" that night. (Larson Dep. at 28-29.) Larson was "not formally written up for this incident or for the deception." (Pl.'s LR 56.1(b) Stmt. ¶ 91.) Plaintiff also states that "Larson's personnel file is peppered with criticism from LaValle, including a performance appraisal . . . with average and below average scores, and notes that reflect 'all basic stuff that is not being done'". (Pl.'s LR 56.1(b) Stmt. ¶ 123.)

First, we note that the deposition testimony does not support plaintiff's assertion that Larson was deceptive with respect to the "incident". In addition, by making a general reference to the disciplinary notes in Larson's file, plaintiff does not show that Larson's professional deficiencies are of "comparable seriousness" to those of plaintiff. See McDonnell Douglas Corp., 411 U.S. at 804. Moreover, as in the case of Brigham, Larson's performance evaluations do not show a level of unsatisfactory performance equal to plaintiff's.[7] Although LaValle testified that both Larson and plaintiff falsified scrap reports, Larson did it two or three times while plaintiff did it "probably over

---

a warning in his file, but this fact alone does not make plaintiff's case. Brigham resigned in January 2002. (Def. Ex. V(U).)

[7] Larson's one evaluation shows a below average score in two areas.

a hundred" times. (LaValle Dep. at 66.) LaValle testified that one of management's areas of focus was the problem of incorrect scrap reports with team leaders. Based on this, plaintiff and Larson do not appear to be similarly situated. Plaintiff has not presented evidence that shows otherwise.

Plaintiff has not brought evidence to our attention that creates an issue of material fact with respect to this element. He has no knowledge of how his paperwork (relating to shift performance) compared with the paperwork of other team leaders. (Pl. Dep. at 127-28.) Plaintiff has not presented specific evidence that shows other team leaders' infractions were of the same nature and seriousness as his, that similar complaints were made with respect to other teams leaders, or that the statements defendant made about his performance were wrong.[8] He presents us with documents from Brigham's and Larson's personnel files, but provides no explanation about the documents' significance or LaValle's critical notes vis-à-vis his own personnel file. In addition, although all team leaders had some problems with paperwork, "the other team leaders worked on them and showed improvement, and [plaintiff] didn't." (LaValle Dep. at 43.) Plaintiff was unresponsive at times as a manager; he often failed to have adequate explanations for incidents that occurred on his shift and he sometimes seemed "half asleep". (McGrew Dep. at 30.) Because plaintiff has failed at this stage to show that similarly situated employees outside his protected class were treated more favorably, plaintiff has failed to make out a prima facie case of disparate treatment.

---

[8] Plaintiff does state that "[n]o documentation in [his] personnel record supports that [he] made the [scrap report] falsifications as LaValle suggests." (Pl.'s LR 56.1(b) Stmt. ¶ 117.) Given that LaValle was inconsistent in his record-keeping, we find the lack of documentation on this particular matter unpersuasive.

## **Pretext**

Even if plaintiff were successful in satisfying the four elements of a prima facie case under McDonnell Douglas, summary judgment for defendant would still be appropriate. Defendant's proffered nondiscriminatory justification for plaintiff's demotion is that he lacked the skills necessary for the team leader position. In essence, plaintiff was a poor performer. Defendant has produced evidence to support its claim. This satisfies defendant's burden. See Smith v. Firestone Tire & Rubber Co., 875 F.2d 1325 (7th Cir. 1989). Plaintiff must now show that this reason is pretext.

To demonstrate pretext, plaintiff must show that defendant's articulated reason for the demotion is "unworthy of credence." Gordon v. United Airlines, Inc.., 246 F.3d 878, 888 (7th Cir. 2001). "[P]retext means deceit used to cover one's tracks." Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002) (citing Grube v. Lau Indus., Inc., 257 F.3d 723, 730 (7th Cir. 2001)).

Plaintiff attempts to make out his pretext argument with the following circumstantial evidence.[9]

### 1. General Employment Practices

The racial composition of the workforce at the Addison facility changed from approximately 90% African-American in 1999 when McGrew arrived to approximately 55% African-American in 2002, with the remaining 45% being Hispanic and Caucasian. (Def.'s LR 56.1(a) Stmt. ¶ 60; Pl.'s LR 56.1(b) Stmt. ¶¶ 20-23.)

---

[9] We have combined some categories of plaintiff's circumstantial evidence.

In November 1999, all four of the team leaders in the blow molding department were African-American. (Pl.'s LR 56.1(b) Stmt. ¶¶ 24, 25). In June 2002, the blow molding department team leaders consisted of two African-Americans and two Caucasians. (Id. ¶¶ 27-29). Neither of the two June 2002 African-American team leaders are from the November 1999 group (Id. ¶ 28.)

LaValle and McGrew each testified during their depositions about an October 2000 interview process for available team leader positions. McGrew testified that defendant received about ten applications and that approximately seven applicants were interviewed. One of the applicants and interviewees was African-American. (McGrew Dep. at 13, 47.) LaValle testified that he interviewed approximately ten to fifteen people, and that "maybe three or four" were African-American. (LaValle Dep. at 22-23.) Ultimately, two Caucasians, Brigham and Larson, were hired. (Def.'s LR 56.1(a) Stmt. ¶¶ 22, 23.)

Another Caucasian team leader was hired in March 2002. McGrew testified he was hired pursuant to a newspaper advertisement. (McGrew Dep. at 13-14) LaValle remembered he was an indirect referral from McGrew's wife. (LaValle Dep. at 25.) McGrew did not remember any details about the number or race of the applicants interviewed for the position. (McGrew Dep. at 13-14.) LaValle testified that no one else was interviewed for that position. (LaValle Dep. at 25.)

Plaintiff presents all of this as evidence of the discriminatory intent behind his demotion. Information relating to an employer's general policy and practice with respect to minority employment may be relevant to a showing of pretext. See McDonnell Douglas Corp., 411 U.S. at 804-05. However, none of this is evidence of racially discriminatory employment practices. Moreover, plaintiff fails to link any of this evidence with his own demotion. See Essex v. United Parcel Svc., 111 F.3d 1304, 1310 (7th Cir. 1997).

Defendant states that the reduction of African-Americans in the workforce was due primarily to a change in hiring methods – from finding new hires primarily through employee referrals to finding new hires through advertising and employment agencies. (Def.'s LR 56.1(a) Stmt. ¶ 63.) Plaintiff does not assert this is a lie; in fact; he knew about the use of the agency and did not feel that the use of an agency was discriminatory. (Pl.'s Dep. at 64.)

Plaintiff has no evidence to suggest the previous African-American team leaders were relieved of their positions for non-legitimate reasons. For two individuals specifically, plaintiff has no knowledge about their job performance, their performance evaluations or their disciplinary history. (Pl.'s Dep. at 73-75; 87-88.)

There is no evidence that McGrew and LaValle were involved in the October 2000 hiring process to the same degree that would indicate their inconsistent testimony reveals racially discriminatory hiring practices. Plaintiff has no knowledge of individuals who have applied for positions at defendant's Addison facility. (Pl.'s Dep. at 78.) In addition, plaintiff's "statistics" regarding the lack of African-American new hires is inadequate to show discrimination. See Smith v. General Scanning, Inc., 876 F.2d 1315, 1321 (7th Cir. 1989) (noting that a failure to provide information about the "pool of applicants" and whether "qualified [African-American] employees were available" makes statistical evidence of hiring "dubious").

2. Disparate Pay Among Team Leaders

It is undisputed that, at no time during McGrew's or LaValle's tenure at the Addison plant, did any African-American team leader make as much money per hour as the lowest paid Caucasian team leader. (Pl.'s LR 56.1(b) Stmt. ¶¶ 98, 99.) As of June 2002, the two African-American team

leaders earned $15.70 and $18.88 per hour; the two Caucasians earned $19.50 and $19.53 per hour. (Pl.'s LR 56.1(b) Stmt. ¶ 30.)

McGrew stated that he never looked closely at the differences in pay, and that, in any event, the disparity resulted from the fact that the Caucasian team leaders were hired from outside the company, and thus their hourly pay had to be competitive to attract them to defendant's facility.

Plaintiff has not presented any evidence to suggest there is any untruth to McGrew's explanation for this rather small pay disparity or that there was an intent to pay African-Americans less because of their race. Moreover, plaintiff fails to link this alleged discrimination to his demotion. See Essex, 111 F.3d at 1310.

### 3. Differing Duties and Responsibilities Based On Race

Plaintiff claims that team leaders have different duties and tasks depending on their race and that Caucasian team leaders were given security codes to the machines as a matter of course, where African-Americans were given the code on as "as-needed" basis. (Pl.'s LR 56.1(b) Stmt. ¶¶ 54, 61, 64, 65.)

Plaintiff's only evidence is that after his demotion, he saw that the Caucasian team leaders had an easier job description because they were not required to work as much with the machines. Team leaders have the same job descriptions. (Def.'s LR 56.1(a) Stmt. ¶ 77.) Derrick Young, an African-American team leader, testified that team leaders have different duties, but also testified that he does not know what the difference is and does not know what other team leaders are required to do. (Young Dep. at 10.) He works with the machines because it is his preference. (Id. at 11-13.) Young also testified that he received the security code for the machines less than a month after he

started as a team leader. (Id. at 13-14.) Mark Baggett, the other African-American team leader, testified that everyone has the same basic job description. (Baggett Dep. at 10.)

Defendant states that any differentiation in tasks performed by the team leaders is due to their backgrounds; team leaders who promoted to that position through the ranks of defendant's workforce were generally more knowledgeable about the machines. Outside team leader hires, in this case Caucasians, were hired because of their supervisory experience. They have less experience with defendant's machines. (Def.'s LR 56.1(a) Stmt. ¶¶ 78, 79.) Plaintiff provides no evidence, except his own conclusion, that African-Americans team leaders have different duties because of any racially-motivated practice on the part of the defendant.

### 4. Differing Disciplinary Procedures

LaValle testified that he has never demoted a Caucasian team leader, nor has he ever suspended a Caucasian team leader. (LaValle Dep. at 44.) LaValle also testified that he has never taken any formal disciplinary action under defendant's company policy against a Caucasian team leader. (LaValle Dep. at 44, 45.) In addition, LaValle testified that although he wrote memos and orally counseled all team leaders as to disciplinary matters (LaValle Dep. at 54), he decided on a case-by-case basis which memos became part of an employee's permanent record (LaValle Dep. at 46.)

These facts alone do not support the conclusion that LaValle disciplined subordinates or maintained personnel files based on race. Brigham had at least one memo in his file which served as a warning that disciplinary action will result if certain behavior is repeated. (Pl.'s Ex. V(E).) Larson's file contains criticism from LaValle. (Pl.'s LR 56.1(b) Stmt. ¶ 123.) Larson received "a

-16-

lot of memos" from LaValle that "weren't really necessary to write" and disagreed with some of the notes he received from LaValle. (Larson Dep. at 35-36.)

5. Promotion of Derrick Young

Derrick Young's job history at defendant's facility is essentially undisputed. His demotion in December 2000 from production mechanic to "utility" and then his promotion back to production mechanic and ultimately to team leader in January 2002, (Pl.'s LR 56.1(b) Stmt. ¶¶ 67, 70, 73.), are "suspicious" according to plaintiff. Plaintiff also finds suspicious that management promoted Young without conducting an external search and that management gave Young a raise in May 2002, about the time he gave his deposition in this case. (Pl.'s Ex. V(G) at 457).)

Defendant states that Young was initially demoted because of a "ripple effect" from the demotion of plaintiff and another team leader, and that Young was promoted to team leader because he was the best candidate to promote into that position. Young was told he was promoted because a mistake had been made. (Young Dep. at 16.) Even if Young's promotion was done in an effort by defendant to demonstrate its racially neutral employment practices, plaintiff has not shown that there is any nexus between Young's promotion and plaintiff's demotion. See Smith, 875 F.2d at 1330.

### 6. Plaintiff Has Been "Singled-Out" by Management for Unfavorable Treatment

Plaintiff refers to the examples of Windhorst and Larson, and LaValle's "selective" record keeping to demonstrate he was disciplined more harshly than others. An employer does have some discretion when determining appropriate punishment for workplace infractions. See Bluebeard's Castle Hotel v. Gov't of Virgin Islands, 786 F.2d 168, 172 (3rd Cir. 1986). As previously discussed, plaintiff does not present sufficient evidence from which a trier of fact would conclude that others' misconduct was as serious or as consistent as plaintiff's. Id.

Pretext requires a showing that defendant's reason for demoting plaintiff was "a lie, . . . a phony reason." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995). Plaintiff asserts that his circumstantial evidence shows that defendant treated employees differently because of race, and from this we should infer defendant's articulated reason for plaintiff's demotion was pretext. Plaintiff's evidence fails to carry his burden to show that there exists an issue of triable fact as to whether his demotion was motivated by race. Haphazard record keeping and management inconsistencies alone do not show that defendant's demotion of plaintiff resulted from discriminatory intent. See Dunn v. Nordstrom, 260 F.3d 778, 787 (7th Cir. 2001). Even if defendant engaged in some discriminatory practices, there is no evidence that discriminatory intent played a part in plaintiff's demotion. See Chambers v. American Trans Air, 17 F.3d 998, 1004 (7th Cir. 1994) (stating that Title VII will not impose liability if company managers' bigotry does not result in injury to the plaintiff). This is not a case of one isolated incident. Plaintiff received numerous warnings identifying poor performance. He was not responsive as a manager and he failed to work on his problems and show improvement. Plaintiff has not shown that defendant's proffered reason, namely his poor performance, was not the actual motivation for the demotion.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact on the claim for disparate treatment that plaintiff asserts against defendant. Defendant is entitled to judgment as matter of law. Accordingly, defendant's motion for summary judgment on this claim is granted. This is a final and appealable order.

**ENTER:**

UNITED STATES DISTRICT JUDGE

DATED: 12/13/02